SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Suite 4000
Los Angeles, CA 90067-3026
Telephone: 310.552.8500
Facsimile: 310.551.8741

PERLETTE MICHÈLE JURA, SBN 242332
pjura@gibsondunn.com
ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
SHAUN A. MATHUR, SBN 311029
smathur@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendants AOL INC., OATH INC., and VERIZON MEDIA INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

EVOX PRODUCTIONS LLC, a Delaware limited liability company,

Plaintiff,

v.

AOL INC., a Delaware corporation; OATH INC., a Delaware corporation; VERIZON MEDIA INC., a Delaware corporation; and DOES 1-10,

Defendants.

CASE NO. 2:20-cv-02907-JWH-JEM

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

[Notice Of Motion And Motion For Summary Judgment; Declaration of Ilissa Samplin; Declaration of Tom Pitts; Declaration of Ray Dorman Filed Concurrently Herewith]

**HEARING:**
Date: July 23, 2021
Time: 9:00 a.m.
Judge: John W. Holcomb

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

| **Defs.' SUF No.** | **Fact** | **Supporting Evidence** |
|---|---|---|
| 1. | Evox and AOL executed a Confidential Image License Agreement in April 2014 (the "license"). | Ex. 3 at 1.[1] |
| 2. | The license authorized AOL to use images from the "Evox Automotive Image Library" on AOL's "Autoblog" website. | *Id.* at 12. |
| 3. | The license stated that "AOL shall have the right to terminate this Agreement for any reason upon thirty (30) days written notice." | *Id.* at 3. |
| 4. | The license stated that "[u]pon termination of the [License] . . . , AOL shall cease use of the Images." | *Id.* at 3. |
| 5. | The license stated that "AOL can store Images internally after termination in AOL's internal storage system for auditing and documentation purposes." | *Id.* at 1. |
| 6. | The license granted Evox "the right to examine and audit all of AOL's records strictly related to the relationship" "for a period of twelve (12) months following | *Id.* at 8–9. |

[1] Unless stated otherwise, Exhibits 1–25 refer to the Exhibits attached to the Declaration of Ilissa Samplin in Support of Defendants' Motion for Summary Judgment ("Samplin Decl."), filed concurrently herewith.

| | | |
|---|---|---|
| | the expiration" of the license "to verify AOL's compliance with the terms of this Agreement." | |
| 7. | The license did not require AOL to provide Evox periodic data on unique views of pages containing Evox's images. | *See generally id.*; Ex. 5 at 8. |
| 8. | The license required Evox to "promptly inform [AOL] of any information related to the Images which could reasonably lead to a claim . . . against [it]." | Ex. 3 at 9. |
| 9. | While the license was in effect, AOL stored Evox's images on AOL's "origin host server." | Ex. 6 at 9; Ex. 7 at 30:12–14, 34:22–38:6, 91:2–21, 137:7–20; Ex. 17 at 36:5–37:10, 51:3–52:20. |
| 10. | The Autoblog website contains an "editorial side." | Ex. 2 at 18:18–19:14; Ex. 7 at 16:1–10. |
| 11. | The editorial side of the Autoblog website "caters to [automobile] enthusiasts and news readers who are interested in automotive news." | Ex. 2 at 18:18–22; Ex. 17 at 20:15–16. |
| 12. | The Autoblog website also contains a "product side." | Ex. 2 at 18:18–19:14; Ex. 7 at 16:11–25. |
| 13. | The produce side of the Autoblog website "caters to people who are researching" or are "in [the] market to | Ex. 2 at 18:23–19:14; Ex. 7 at 16:11–25. |

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| | purchase vehicles . . . or sell their own vehicles." | |
| 14. | The product side of Autoblog contains several "research tools." | Ex. 2 at 22:3–7; Ex. 7 at 31:16–32:2, 54:8–60:19, 75:12–18. |
| 15. | The product side of Autoblog contains a "Year Make Model" tool where users can search for specific vehicles. | Ex. 2 at 77:1–11. |
| 16. | The product side of Autoblog contains a "Car Finder" tool where users can search for vehicles based on certain criteria. | *Id.* at 22:8–14. |
| 17. | The product side of Autoblog contains a "Compare" tool where users can compare vehicles side by side. | *Id.* at 22:15–17 |
| 18. | AOL used Evox images only on the product side of the Autoblog site. | Ex. 6 at 8–9; Ex. 2 at 30:9–18, 31:14–18, 71:1–21. |
| 19. | AOL also used images from Autodata Solutions, another image provider, on the product side of Autoblog because "there were some gaps" in the coverage that Evox provided (i.e., certain vehicles for which Evox did not supply images). | Ex. 17 at 22:8–9; Ex. 7 at 31:10–32:2, 72:12–23; Ex. 2 at 29:6–24; 39:10–14. |
| 20. | AOL decided to terminate the license to reduce costs and transition to using exclusively Autodata images on Autoblog. | Ex. 2 at 99:2–17; 107:17–22, 120:2–121:13, 140:15–20. |

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| 21. | Before terminating the license, AOL began removing Evox images from Autoblog and replacing them with Autodata images. | Ex. 7 at 71:1–72:24, 79:3–15, 138:6–13. |
| 22. | Dorman developed a workstream in December 2016, prior to license termination, to "make the switchover" to Autodata images "so that [AOL] would no longer be displaying Evox images" after the license terminated. | Ex. 2 at 127:18–23, 151:9–154:21. |
| 23. | Tom Pitts is, and was in December 2016, "the lead back-end developer" for Autoblog. | Ex. 7 at 11:22–24; Declaration of Tom Pitts ("Pitts Decl.") ¶ 3. |
| 24. | Dorman delegated responsibility to Pitts to remove Evox images from display on Autoblog. | Ex. 2 (Dorman Depo.) at 151:21–153:15; Pitts Decl. ¶ 5; Declaration of Ray Dorman ("Dorman Decl.") ¶ 4. |
| 25. | Pitts rewrote software code in December 2016 so that Evox images would no longer appear on Autoblog if a user visited the site. | Ex. 7 at 71:1–12, 81:2–82:3, 92:6–12, 121:7–25, 123:2–11, 130:17–131:6, 138:6–10; Pitts Decl. ¶ 6. |
| 26. | Pitts disabled the display of Evox images on all parts of the product side of Autoblog, except that he inadvertently "missed changing" the images on "one small section of [C]ompare." | Ex. 7 at 123:12–15; 124:5. |

| | | |
|---|---|---|
| 27. | After Pitts rewrote the software code in December 2016, Dorman reviewed Pitts's work and concluded "this all looks good from what I can tell." | Dorman Decl. ¶¶ 5–6; Pitts Decl. ¶ 6; Ex. 8 at 1. |
| 28. | After December 2016, "the correct image" (i.e., an Autodata image) would have appeared if a user visited most sections of Compare, whereas Evox images might have appeared on "part of" Compare. | Ex. 7 at 123:16–124:6. |
| 29. | The license terminated effective February 2017. | Ex. 2 at 107:17–22, 120:2–121:13, 140:15–20. |
| 30. | Shortly after the license terminated, Evox informed AOL that Evox images may have still been used "in the style tab" on Autoblog. | Dorman Decl. ¶ 8. |
| 31. | AOL promptly addressed Evox's concern that Evox images may have still been used "in the style tab" on Autoblog after the license terminated. | *Id.* ¶ 8. |
| 32. | Pitts learned that Evox images could have been called up on a small section of Compare after the Evox images no longer existed on AOL's server. | Ex. 7 at 124:7–21. |
| 33. | Upon learning that some pages were set to "call[] Evox images that don't exist," | *Id.* at 124:12–15. |

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| | Pitts "fixed it" so that those webpages would call "Autodata images." | |
| 34. | In June 2017, AOL deleted all Evox images from AOL's server. | Ex. 7 at 83:8–18, 92:23–93:9, 102:13–103:8, 119:19–23, 123:12–125:18; Ex. 10 at 51:12–15; Ex. 6 at 8–9; Ex. 9 at 2; Pitts Decl. ¶¶ 8–9. |
| 35. | After AOL deleted all Evox images from its server in June 2017, no Evox images could have been accessed through AOL's server. | Ex. 7 at 131:7–14; Pitts Decl. ¶¶ 8–9. |
| 36. | Evox maintains a "compliance department." | Ex. 11 at 28:7–11, 33:16–22; Ex. 16 at 22:25–23:5; Ex. 4 at 6–7. |
| 37. | The compliance department consisted of two employees in 2017: Barry Thompson and Tyler Alexander. | Ex. 16 at 24:3–6. |
| 38. | Thompson is Evox's Vice President. | Ex. 11 at 26:9–18. |
| 39. | Alexander is an Evox data analyst. | Ex. 16 at 20:19–21:1. |
| 40. | Evox's compliance department is charged with investigating whether current and former licensees are using Evox images outside the scope of their licenses. | Ex. 16 at 22:3–6, 24:22–25:8, 49:8–12; Ex. 11 at 33:17–37:6. |

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| 41. | Evox's compliance department follows a "normal pattern" when investigating current and former licensees. | Ex. 11 at 42:13–23. |
| 42. | Evox sends an average of six demand letters per year. | *Id.* at 53:17–54:6. |
| 43. | Since 2007, Evox has obtained 20 to 30 settlements. | *Id.* at 54:13–56:5. |
| 44. | [REDACTED] | *Id.* at 129:12–133:13, 229:14–21. |
| 45. | [REDACTED] | *Id.* at 224:9–225:11, 231:24–232:14. |
| 46. | As part of Evox's normal pattern, Alexander visits the current or former licensee's website to "figure out the structure of the website." | Ex. 16 at 32:4–34:25, 49:8–50:14. |
| 47. | Alexander then writes a script to automatically "crawl" or "scrape" the site to compile a list of URLs for each webpage where Evox images might appear. | *Id.* |
| 48. | Alexander then runs another automated process to determine whether each URL corresponds to an actual Evox image and, if so, which Evox image. | *Id.* at 36:9–38:12. |

| | | |
|---|---|---|
| 49. | Alexander uses this process to determine whether Evox images might be available on the licensee's website. | *Id.* at 62:8–63:12. |
| 50. | Alexander does not determine "whether . . . members of the public . . . are actually viewing those images" identified during his process. | *Id.* at 35:2–7. |
| 51. | Alexander also does not determine whether the "licensee had actually served [an] image to anybody else besides [himself]." | *Id.* at 63:8–16. |
| 52. | Alexander does not "do anything to determine whether a former licensee has served the image to a user other than [himself]." | *Id.* at 64:18–22. |
| 53. | Alexander finds only "that there is . . . potential for display to a member of the public." | *Id.* at 64:18–65:1. |
| 54. | Alexander then transmits the URL lists he has created to a consultant. | *Id.* at 43:13–45:11. |
| 55. | Tennyson Maxwell was Evox's "technical consultant." | Ex. 11 at 42:15–44:8. |
| 56. | Tennyson Maxwell was Evox's exclusive consultant from 2007 to 2017. | *Id.* at 25:22–23; 42:24–44:8. |
| 57. | Tennyson Maxwell is owned and operated solely by Michael Del Monte. | Ex. 12 at 8:11–9:6, 54:2–10. |

| | | |
|---|---|---|
| 58. | Evox and Del Monte had a "well-established work flow." | Ex. 16 at 94:22–24. |
| 59. | Evox used Del Monte's services approximately 60 times from 2007 to 2017. | Ex. 11 at 42:24–44:8, 53:17–54:6, 173:23–174:25 |
| 60. | When Evox transmitted URL lists to Del Monte, he would "verify that the images appeared on the web page." | Ex. 16 at 45:7–11, 71:19–73:3. |
| 61. | Del Monte would "provide a report asserting that" Evox images appeared on the web page. | *Id.* at 46:22–47:7. |
| 62. | Del Monte "doesn't find anything" during the course of his work for Evox; rather, he "confirms things [Evox] find[s]." | Ex. 11 at 164:18–22; Ex. 12 at 12:23–25, 40:22–41:4; Ex. 16 at 74:23–75:5. |
| 63. | Del Monte uses an automated process in his work for Evox. | Ex. 12 at 34:10–22. |
| 64. | After receiving Del Monte's report, Evox hires counsel on a contingency fee basis to send the current or former licensee a demand letter threatening litigation. | Ex. 11 at 43:9–44:1; 53:6–11, 177:3–6. |
| 65. | It typically takes Evox "[t]hree to six months" from the beginning of its investigation to "get[] a letter out." | *Id.* at 48:4–50:4, 51:1–18. |
| 66. | Evox investigated AOL in May and June 2017. | Ex. 16 at 93:5–6; 96:13–97:4. |

| | | |
|---|---|---|
| 67. | Evox followed its normal pattern when investigating AOL. | Ex. 11 at 177:3–6; Ex. 16 at 93:21–95:1. |
| 68. | Alexander testified that he conducted his investigation of AOL by going "directly to Autoblog." | Ex. 16 at 89:12–90:6. |
| 69. | Evox determined only that "AOL made [Evox] images available to the public" after the license terminated. | Ex. 11 at 41:16–42:4, 212:24–25. |
| 70. | Evox did not "discover whether any . . . members of the public . . . actually accessed and viewed the Evox images on the Autoblog site" after the license terminated. | Ex. 16 at 92:16–21, 98:13–17, 112:18–113:10, 115:24–116:12, 123:11–16. |
| 71. | Evox did not "discover whether AOL had actually served Evox images to members of the public after the license terminated." | *Id.* at 92:22–25. |
| 72. | Thompson testified that Evox does not have "any evidence" that "a single individual . . . saw any of the Evox images on Autoblog after the license terminated in February 2017." | Ex. 11 at 218:11–16; Ex. 24 at 3–4. |
| 73. | Thompson agreed that Evox does not know whether any members of the public "actual[ly] access[ed]" and "viewed" Evox images on Autoblog after the license terminated. | Ex. 11 at 41:16–42:4, 208:22–209:7. |

| | | |
|---|---|---|
| 74. | Thompson testified: "After February '17, can I point to a generalized member of the public that saw my images? I've answered that three or four or five times. And, no, I can't." | *Id.* at 222:19–22. |
| 75. | Del Monte used an automated process to confirm that Evox images were "available from the AOL server" at the time he scanned the server. | Ex. 4 at 4–5; Ex. 16 at 47:11–15, 95:5–99:18, 102:7–13; Ex. 12 at 41:17–44:23, 45:8–46:11, 57:8–60:24, 62:8–63:7, 70:1–16, 80:10–19, 84:11–85:22, 92:2–7, 97:6–100:5, 108:16–109:12, 122:4–123:9, 127:20–129:1, 131:4–13, 132:17–135:21, 139:1–2, 160:7–22; Ex. 13 at 1; Ex. 14 at 1; Ex. 15 at 1. |
| 76. | Del Monte did not "determine . . . whether any member of the public, in fact, viewed [an] Evox image" through AOL's server after February 2017. | Ex. 12 at 47:19–48:1. |
| 77. | Del Monte testified that he did "not verify[]" whether anyone had seen Evox images through AOL's server. | *Id.* at 48:9–11, 49:6–14, 95:4–14, 105:14–16. |
| 78. | Del Monte could not say "whether any member of the public actually saw the | *Id.* at 147:10–16. |

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| | images that [he] located during [his] scans after February 2017." | |
| 79. | Evox did not ask Del Monte "to determine whether any member of the public . . . had viewed the Evox images at the URLs provided to [him] by Tyler Alexander after February 2017." | *Id.* at 147:17–23. |
| 80. | Evox did not ask Del Monte "to determine viewership" of Evox images or the webpages on which they may have appeared. | *Id.* at 50:16–25, 117:19–118:2. |
| 81. | AOL's access logs would have shown whether AOL ever served an Evox image to a member of the public after the license terminated effective February 2017. | Ex. 7 at 126:13–127:2. |
| 82. | Evox "never exercised [its] contractual right to examine and audit AOL's records relating to AOL's use of [Evox's images]." | Ex. 23 at 2; Ex. 11 at 138:14–21, 211:9. |
| 83. | Alexander agreed that Evox's audit right "presumably" would have permitted Evox to inspect AOL's access logs. | Ex. 16 at 82:22–83:7. |
| 84. | When asked why Evox did not exercise its contractual audit right, Thompson testified that he "can't identify a benefit of doing that" since Evox was able to | Ex. 11 at 139:11–25. |

| | | |
|---|---|---|
| | determine on its own that certain Evox images were available on AOL's server after license termination. | |
| 85. | Thompson testified that Evox "could have reached out to AOL and asked" for "user data," but he "didn't feel he needed to" because Evox "didn't need any more data from AOL" beyond what Evox had found. | *Id.* at 140:2–142:22, 147:9–17. |
| 86. | Evox completed its investigation of AOL in July 2017. | Ex. 15 at 1. |
| 87. | Evox did not contact AOL about Evox's purported findings until August 2018. | Ex. 11 at 211:3–4. |
| 88. | As part of its normal pattern, Evox does not typically "immediately inform the licensee of its findings." | Ex. 16 at 43:9–12. |
| 89. | Evox does not immediately notify a licensee of its findings because such notice may cause the licensee to comply with its license and the "evidence" of alleged infringement "[to] disappear[]." | Ex. 11 at 42:15–19, 45:8–48:3. |
| 90. | Evox sent AOL a demand letter in August 2018. | Ex. 18 at 1. |
| 91. | In its August 2018 demand letter, Evox threatened to seek over $200 million in statutory damages under the Copyright | *Id.* |

|  | | |
|---|---|---|
|  | Act based on its claim that AOL had infringed 299,507 images. | |
| 92. | In the August 2018 demand letter, Evox stated that it had found that AOL had made 299,507 Evox images "available to the public" after license termination. | *Id.* at 2. |
| 93. | Thompson testified that it would have cost AOL less than $500,000 to license the 299,507 images that were the subject of the August 2018 demand letter. | Ex. 11 at 216:17–217:22. |
| 94. | Thompson testified that Evox did not immediately inform AOL of Evox's findings in 2017, but rather waited until August 2018, because Evox was "concerned that AOL would take [the images] down." | *Id.* at 177:8–14, 213:18–214:18. |
| 95. | AOL's access logs rolled off of AOL's systems in 2017 after "approximately two weeks" in the ordinary course of business depending "upon how much disc space [wa]s available." | Ex. 10 at 40:2–12, 44:3–9, 46:16–48:17, 50:16–52:5. |
| 96. | AOL's access logs from the origin server hosting Evox's images in 2017 were overwritten after about two-weeks. | *Id.* at 44:3–9. |
| 97. | AOL's access logs showing whether any Evox images served between February 2017 and June 2017 are "long gone." | Ex. 10 at 50:16–51:7; Ex. 7 at 44:5–50:6; Ex. 2 at 85:19–88:7. |

| | | |
|---|---|---|
| 98. | By August 2018, when Evox sent its demand letter to AOL, there was "[n]o way" to determine whether Evox images had been served to users before June 2017. | Ex. 7 at 126:9–20, 129:21–130:4. |
| 99. | There currently is "no" "way that Autoblog can determine how many Evox images were served between February 2017 and June 2017." | Ex. 10 at 50:16–19. |
| 100. | When asked whether he had any "knowledge . . . whether members of the public were actually served with any of the 299,507 images" at issue after February 2017, Evox's expert Jonathan Hochman could not identify any "evidence that would show that." | Ex. 19 at 56:4–57:23. |
| 101. | When asked whether he had "seen . . . any evidence that an Evox image was served to a member of the public after the license terminated," Evox's expert Jeffrey Sedlik could not identify any such evidence. | Ex. 21 at 164:1–166:21. |
| 102. | Evox expert Jeffrey Sedlik testified that he had not "seen evidence that some person out there in the public . . . used or accessed an [Evox] image" through AOL's server after February 2017. | *Id.* at 172:21–25. |

DATED: June 24, 2021

SCOTT A. EDELMAN
PERLETTE MICHÈLE JURA
ILISSA SAMPLIN
SHAUN A. MATHUR
GIBSON, DUNN & CRUTCHER LLP

By: */s/ Scott A. Edelman*
Scott A. Edelman

Attorneys for Defendants AOL INC., OATH INC., and VERIZON MEDIA INC.

17

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-02907-JWH(JEMX)

Gibson, Dunn & Crutcher LLP